NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0379n.06

Nos. 13-3803/3814/3883/4019/4081/4086

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>DARIN WRIGHT, et al.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants-Appellants.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

FILED

May 27, 2015
DEBORAH S. HUNT, Clerk

OPINION

BEFORE:    SUHRHEINRICH and GRIFFIN, Circuit Judges; LEITMAN, District Judge.[*]

SUHRHEINRICH, Circuit Judge

Defendants-Appellants Darryl Colbert, Dale Colbert, Jeremy Duncan, Darin Wright, Wesley Black, and Antowan Logan (collectively, "Defendants") appeal the denial of their motions to suppress evidence derived from a series of wiretaps. Additionally, Antowan Logan challenges the validity of his guilty plea. For the following reasons, we **AFFIRM** the judgment of the lower court.

**BACKGROUND**

Defendants' prosecution stemmed from a federal drug trafficking investigation in Akron, Ohio. Initially, the principal targets of that investigation were Dante Branch and Louis Harmon,

_____

[*] The Honorable Matthew Leitman, United States District Judge of the Eastern District of Michigan, sitting by designation.

1

known Akron area drug traffickers.[1]  In order to aid its investigation, the United States sought at various times six Title III orders authorizing the interception of wire communications to and from cellular telephones used by individuals suspected of trafficking drugs:

(1)  The December 7, 2011 Title III Application ("Application #1"), which sought the interception of calls to and from a telephone used by Harmon.

(2)  The January 5, 2012 Title III Application ("Application #2"), which sought to extend the previous wiretap of Harmon's telephone.

(3)  The January 20, 2012 Title III Application ("Application #3"), which sought the interception of calls to and from a telephone used by Branch, as well as the interception of calls to and from a new telephone used by Harmon.

(4)  The February 18, 2012 Title III Application ("Application #4"), which sought to extend the wiretap of Branch's telephone, and also sought the interception of calls to and from two telephones used by Darryl Colbert.

(5)  The March 19, 2012 Title III Application ("Application #5"), which sought to extend the wiretap of Branch's telephone, and also sought the interception of calls to and from a telephone used by Dale Colbert, a new telephone used by Branch, and a telephone used by Derrick Watson.[2]

(6)  The May 3, 2012 Title III Application ("Application #6"), which sought to extend the initial wiretap of Branch's telephone, and also sought the interception of calls to and from a telephone used by Jeremy Duncan and a new telephone used by Dale Colbert.

In support of each wiretap application, FBI Special Agent Douglas Porrini ("SA Porrini") provided an affidavit stating that there was probable cause to believe the interceptions would

---

[1] Branch and Harmon are not part of this appeal.
[2] Watson is not part of this appeal.

reveal evidence of drug trafficking and that the interceptions were necessary to achieve the objectives of the investigation. The issuing district judge approved each application.

Based on traditional investigative techniques, such as physical surveillance and the use of confidential sources, and conversations intercepted through the wiretaps, investigators learned that Branch, a major cocaine and marijuana distributor in the Akron area, had two drug sources—one for cocaine and another for marijuana.[3] His source of cocaine was a drug trafficking organization ("DTO") operated out of California by twin brothers Darryl and Dale Colbert ("the Colbert DTO"). The Colbert brothers would hide cocaine inside engine blocks and then ship them to various locations in the Akron area. One of the brothers would then travel to Ohio in order to distribute the cocaine to Branch, as well as to local drug dealers Darin Wright, Wesley Black, and Antowan Logan.

Investigators further discovered that Branch's source of marijuana was another California DTO, run by Anthony Treggs ("the Treggs DTO"). The Treggs DTO would transport marijuana to Ohio through a semi-tractor trailer driven by Jeremy Duncan. Branch acquired that marijuana and sold it to Black. However, law enforcement learned that the Colbert DTO was distributing marijuana in the Akron area as well. Ultimately, investigators determined that the Colbert DTO was responsible for distributing over 100 kilograms of cocaine and hundreds of pounds of marijuana within the Akron area, and the Treggs DTO was responsible for distributing truckloads of marijuana within that region.

On June 7, 2012, a federal grand jury in the Northern District of Ohio indicted 12 individuals, including the Colbert brothers, Duncan, Wright, and Black, principally for their

---

[3] As evidenced by Application #1 and Application #2, Harmon was the initial focal point of the investigation. But by Application #3, investigators learned that Branch was importing large amounts of drugs into Ohio, and Harmon ceased to be the primary target of the investigation.

roles in a series of drug conspiracies. On September 26, 2012, a superseding indictment added Logan and one other individual.[4]

Defendants each filed motions to suppress evidence derived from the wiretaps. The district court denied all of the motions. Defendants subsequently entered conditional guilty pleas to various drug trafficking offenses. This appeal followed.

## DISCUSSION

### I. Suppression Motions

When evaluating a district court's denial of a motion to suppress evidence derived from a wiretap, we review findings of fact for clear error and questions of law de novo. *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007) (citing *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002)). Moreover, the issuing judge's determination is entitled to "great deference." *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000).

### A. Darryl Colbert

### 1. Necessity

Darryl Colbert challenges Application #3 through Application #6, alleging that these applications did not comply with the wiretap statute's "necessity" requirement.

We review the issuing judge's finding of necessity for an abuse of discretion. *See Corrado*, 227 F.3d at 539; *see also United States v. Canales Gomez*, 358 F.3d 1221, 1225 (9th Cir. 2004) ("The issuing judge's decision that the wiretap was necessary is reviewed under an abuse of discretion standard.").

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, governs the legal requirements for wiretaps. The statute requires that "[e]ach application

---

[4] The other individuals indicted were Branch, Harmon, Regina Skinner, Marvin Skinner, Derrick Watson, Gavin Parker, Gerald Griffin, and William Brown. They are not part of this appeal.

for an order authorizing or approving the interception of a wire . . . communication" include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This "necessity" requirement is designed "to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime" and to prevent wiretapping from being "routinely employed as the initial step in criminal investigation." *United States v. Landmesser*, 553 F.2d 17, 19-20 (6th Cir. 1977) (citations omitted). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Alfano*, 838 F.2d 158, 163-64 (6th Cir. 1988) (citation omitted). The government "need not prove the impossibility of other means of obtaining information," as "the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart*, 306 F.3d at 305.

In his supporting affidavits for Application #3 through Application #6, SA Porrini addressed whether non-wiretap, or "traditional," investigative techniques had been tried.[5] If investigators attempted a specific technique, SA Porrini explained why that technique provided information of limited value. If investigators did not attempt a particular technique, SA Porrini articulated why that technique would not have gleaned viable information.

---

[5] The supporting affidavits for Application #3 through Application #6 differed to the extent that SA Porrini incorporated new information that arose from the ongoing investigation, especially regarding new suspects like the Colbert brothers. However, SA Porrini's basic analysis and conclusions about the success of traditional investigative techniques remained unchanged from affidavit to affidavit.

In doing so, SA Porrini described specifically and factually the following investigative techniques: (1) surveillance, which included physically observing the investigation's targets, videotaping them with pole cameras, tracking them through cell phone GPS or "cell site" data, and attaching tracking devices to their vehicles; (2) the use of confidential sources; (3) the use of grand jury subpoenas; (4) the use of interviews, which sought to compel cooperation by revealing to the targets evidence gathered against them; (5) the collection of telephone subscriber information through toll record and pen register analysis; (6) the use of trash searches; and (7) the execution of search warrants on suspected "stash houses." SA Porrini concluded that each of these traditional investigative techniques was inadequate to uncover the full extent of illegal activity, necessitating the use of a wiretap.

On appeal, Darryl Colbert's necessity claim primarily argues that the supporting affidavits for these applications (1) used generic "boilerplate" language when stating that traditional investigative techniques were unlikely to be successful or too dangerous to attempt; (2) discounted many traditional investigative techniques without attempting them in good faith; (3) diminished the success of techniques that were effective; and (4) contained false statements and omissions that gave the impression a wiretap was necessary.

These contentions lack merit. We have examined SA Porrini's lengthy affidavits in support of Application #3 through Application #6, and we find that they establish necessity under an abuse of discretion standard. As described above, SA Porrini devoted a section to numerous non-wiretap methods of investigation. In each section, SA Porrini "explained in depth why ordinary methods of investigation failed to achieve all of law enforcement's objectives, why other methods were contemplated but determined to be unlikely to succeed if attempted, and why certain methods would be likely to alert the co-conspirators to the ongoing investigation."

*United States v. Patel*, 579 F. App'x 449, 454 (6th Cir. 2014). *See also Stewart*, 306 F.3d at 305 (deeming necessity satisfied where affidavit provided "a tremendous amount of information" and included "a statement as to . . . specific investigative techniques that had been utilized, including confidential informants and cooperating witnesses, controlled purchases of drugs, consensual recordings, physical surveillance, and telephone records").

Colbert attempts to minimize the level of detail SA Porrini provided, claiming that he employed "boilerplate" language applicable to any Title III investigation. But the "mere fact that the affidavit . . . rested in part on statements that would be equally applicable to almost any . . . case [of this kind] does not render the affidavit insufficient" so long as there is "information about particular facts . . . which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation." *Landmesser*, 553 F.2d at 20 (quotation marks and citations omitted). As the district court explained when addressing Colbert's suppression motion below:

> Porrini's affidavit contains a comprehensive and case specific discussion, not boilerplate, as to why traditional investigative techniques had been or likely would have been unsuccessful in attaining the overall objectives of the investigation. Each of the successive affidavits detailed the progress of the expanding investigation which lead to the wiretaps of Darryl Colbert's cellular telephones.

Upon reviewing these affidavits, we are convinced that SA Porrini offered case-specific examples as to why traditional surveillance techniques would not achieve the goals of the investigation, contrary to Colbert's assertion of "boilerplate" language.

Finally, Colbert contends that the investigators never attempted a full panoply of surveillance techniques. For example, Colbert states that law enforcement did not use a tracking device on Branch's vehicle, even though Branch did not suspect that he was being tracked. Similarly, Colbert remarks that investigators did not attempt trash searches beyond the

residences of Harmon and Branch. But the United States is "not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. As SA Porrini oversaw the investigation, he was in the best position to judge whether an avenue of investigation was likely to achieve the investigation's objectives. "[T]he prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried . . . ." *Landmesser*, 553 F.2d at 20. Consequently, we concur with the reasoning of the district court:

> While defendant . . . parse[s] each technique and contend[s] that more should have been done with the techniques that were working, and attempts should have been made with those that were deemed non-viable, the Court agrees with the government that a "hyper-technical and speculative analysis" is inappropriate. Rather the affidavit is assessed in a practical and common sense fashion.

Given SA Porrini's experience and the realities of a complex drug conspiracy, the affidavits established necessity. *See United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011) (finding necessity satisfied when the supporting affidavit "specifically mentioned that the government used a confidential informant, consensual recordings, a pen register, physical surveillance, and documents before resorting to the wiretap"); *Stewart*, 306 F.3d at 305-06 (noting that wiretapping was "particularly appropriate" when "various members of the drug conspiracy facilitated the criminal enterprise through multiple telephone conversations from several locations" and the "government could [not] have uncovered the full scope of the conspiracy, especially not in a relatively safe manner, without the wiretaps" (citation omitted)); *Alfano*, 838 F.2d at 164 (concluding that affidavit established necessity when government "indicated the steps that had been taken with regard to other investigative targets, and the difficulties in placing an informant in or maintaining continual surveillance of those involved in far-flung operations, including involvement of a number of members of a close-knit family

group"). In light of the "great deference" owed the issuing judge, as well as the affidavit's detailed discussion of other investigative techniques, the district court did not err in its determination.

Colbert also purports that SA Porrini made false statements and omissions in his affidavits that distorted the issuing judge's necessity determination. He cites three allegedly material and reckless false statements made in Application #3: (1) the assertion that Branch and Colbert were associated with the Los Angeles Crips street gang; (2) the assertion that law enforcement found over $10,000 and what appeared to be a drug ledger during an October 2010 traffic stop of Colbert; and (3) the assertion that there was probable cause to believe a substantial DTO involving current or past Crips members was operating from Los Angeles and Akron. He cites an additional allegedly false statement in Application #4: the characterization of Colbert as a known California cocaine trafficker. Colbert believes this statement implied SA Porrini had first-hand knowledge that Colbert was trafficking in cocaine. Colbert further insists that the affidavits omitted that "[t]here was absolutely no mention of the use of weapons, the use of violence, or the use of violent threats" in any of the intercepted conversations. He concludes that these false statements and omissions gave the issuing judge the impression that the targets of the investigation were violent individuals, which lowered the United States' bar for showing necessity by making traditional investigative techniques appear too dangerous.

Colbert invokes *United States v. Rice* in support of his position. After conducting an evidentiary hearing, the district court in that case found that investigators misled an issuing judge about the necessity of a wiretap when the supporting affidavit falsely stated that law enforcement had conducted physical surveillance on the investigation's targets and faced an unreasonable risk

of danger. *Rice*, 478 F.3d at 707-09. The Sixth Circuit reviewed the affidavit and held that the district court did not clearly err in that determination. *Id.* at 710-11.

*Rice* is inapposite. In that case, the district court determined that the affiant made false or misleading statements in the wiretap application. In contrast, the court below concluded that Colbert offered no proof that SA Porrini's statements were false. *See also United States v. Dusenberry*, No. 94-3804, 1996 WL 306517, at *3 (6th Cir. June 6, 1996) (finding necessity challenge meritless where defendant "has not alleged any specific falsehoods in the affidavit concerning the necessity issue"). Moreover, it is unlikely that SA Porrini's statements even gave the impression that Colbert was violent. SA Porrini never expressly described any of the targeted individuals as violent. While Colbert contends that the statements associating him with the Crips implied that he was violent, without more information, this affiliation alone would not definitively suggest a violent temperament.

### 2. *Franks* Hearing

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that a defendant is entitled to a hearing to determine whether the affidavit contained a false statement when that defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56. "The defendant must specifically point to the disputed portions of the challenged affidavit, and must support these charges with an offer of proof." *Stewart*, 306 F.3d at 304. If this burden is met, the court must reconsider the affidavit without the disputed portions and determine whether probable cause still exists. *Id.* at 304-05. If probable cause no longer exists,

the court must then hold a full evidentiary hearing to determine whether the affidavit was properly submitted. *Id.* at 305.

Colbert states that he deserved a *Franks* hearing because SA Porrini's affidavit in support of Application #4 made three false statements: (1) that Colbert was a known California cocaine trafficker; (2) that Colbert was searched during an investigative traffic stop in October 2010, with officers seizing over $10,000 in cash and what appeared to be a drug ledger; and (3) that Branch and Colbert were affiliated with the Los Angeles Crips street gang, carrying the implication that they were violent individuals.

The district court correctly held that Colbert "does not make a substantial preliminary showing because he does not offer proof the statements were false and he does not analyze the affidavits without the statements." Nowhere in his brief does Colbert provide proof that these statements were false. Instead, he merely alleges that SA Porrini's statements suggested an ulterior motive. For instance, Colbert claims that SA Porrini associated Branch and Colbert with the Crips in order to insinuate they were violent individuals, thus making normal surveillance riskier in the eyes of the issuing judge. As the district court noted, however, SA Porrini's affidavit never even stated that these individuals were violent. Similarly, Colbert improperly shifts the burden of proof back to the United States. For example, he argues that the government failed to substantiate its repeated allegations that Colbert was previously arrested during an October 2010 traffic stop, leading to the discovery of drug money and ledgers during the search incident to that arrest. But the burden is on Colbert to prove that statement was false, and he did not satisfy this burden. Accordingly, the district court correctly denied Colbert's request for a *Franks* hearing. *See Poulsen*, 655 F.3d at 504-505 (holding that a district court correctly denied

the defendant a *Franks* hearing when it determined that the defendant "has not made any showing, let alone a 'substantial preliminary showing'").

## B. Dale Colbert

### 1. Necessity

Dale Colbert contends that the affidavits in support of Application #1 and Application #2 failed to satisfy Title III's necessity requirement because they did not demonstrate that investigators exhausted traditional investigative techniques before seeking a wiretap. However, he lacks standing to challenge these applications. "Any aggrieved person" may move to suppress the contents of a wire or oral communication intercepted under Title III. 18 U.S.C. § 2518(10)(a). This "aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). As the district court noted, the wiretaps sought under Application #1 and Application #2 did not intercept Colbert's conversations or target any telephones used by Colbert. Indeed, neither affidavit in support of the applications even mentioned Colbert as a target of the investigation. *See United States v. Cooper*, 868 F.2d 1505, 1510 (6th Cir. 1989) (holding that when another individual's telephone was wiretapped, a defendant had standing to challenge only the interception of conversations in which he participated). Moreover, because Colbert did not address Application #2 in his original suppression motion, he waives this challenge on appeal. "Even when a party has brought a pretrial suppression motion, . . . any new suppression arguments raised for the first time on appeal that were not contained in the original suppression motion will be deemed waived under [Federal Rule of Criminal Procedure] 12(e)." *United States v. Lopez-Medina*, 461 F.3d 724, 738 (6th Cir. 2006).

Colbert similarly challenges the supporting affidavit for Application #5 and Application #6 on the basis of necessity, but these claims fall short. First, Colbert did not challenge Application #6 in his suppression motion below, so his argument on appeal is waived. Second, Colbert's challenge to Application #5 repeats his brother Darryl Colbert's criticisms of that application, and it fails for the same reasons.

### 2. Probable Cause

Colbert argues that the affidavit in support of Application #5 failed to establish probable cause that he trafficked drugs. Citing *Illinois v. Gates*, 462 U.S. 213, 279 (1983), he claims that the affidavit was deficient because investigators relied on six unreliable and uninformed confidential sources, thus invalidating probable cause.

As the district court explained, however, Colbert ignores the fact that these confidential sources provided reliable information. In his supporting affidavit for Application #5, SA Porrini maintained that he had probable cause to believe Colbert was trafficking drugs based on information provided by CS-6, an informant. CS-6 told investigators that the California-based Colbert DTO had been importing large amounts of cocaine to the Canton/Akron area since 2010, and he claimed to have witnessed nine or ten loads of cocaine arrive in Canton area warehouses. CS-6 further averred that the cocaine was being hidden in engine blocks and that one of the Colbert brothers would travel to Ohio in advance of a shipment in order to distribute the cocaine.

In his affidavit, SA Porrini explained that investigators corroborated the information provided by CS-6. For instance, investigators checked the bills of lading associated with the warehouse deliveries and confirmed that they were coming from California, where the Colberts lived. Investigators conducted more surveillance and learned that an engine block arrived at an

Akron business named Massey & Sons Autobody on February 17, 2012, and another shipment arrived at Massey & Sons on February 21, 2012. On both those occasions, investigators observed Dale Colbert at that business, which corroborated CS-6's claim that a Colbert brother always traveled to Ohio in order to distribute the cocaine.

Similarly, SA Porrini stated that on January 27, 2012, CS-6 informed investigators that one of the Colbert brothers contacted him to advise CS-6 that the other Colbert brother would be visiting the Akron area in the next few days. Investigators corroborated this information through intercepted conversations, learning that Darryl Colbert was arranging travel to Ohio. Finally, SA Porrini stated that intercepted communications suggested the Colbert brothers completed a cocaine shipment from California to Akron, which arrived on February 21, 2012, and were arranging for a similar shipment of cocaine to be sent to the Akron area in early March. Investigators also intercepted Dale and Darryl Colbert discussing how much their unknown supplier was charging for each kilogram of cocaine. On March 12, 2012, SA Porrini obtained a search warrant for the contents of a shipment to Massey & Sons, which revealed 17 kilograms of cocaine hidden in an engine block. This again confirmed CS-6's information.

As such, SA Porrini's affidavit contained well-corroborated information provided by CS-6. Based on the totality of the circumstances, SA Porrini had probable cause to believe that Colbert was involved in drug trafficking. *See United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009) (finding the existence of probable cause when an informant's information was derived from personal observation of illegal activity, and independent law enforcement investigation corroborated the informant's information).

### 3. Minimization

Colbert avers that under Title III the United States "failed to follow proper minimization," with law enforcement officers recording conversations that involved "personal, non-criminal matters." But he fails to prove a violation of the minimization requirement. As with his original suppression motion, Colbert's appellate brief articulates the legal requirement for minimization, but it never specifically identifies the agents who failed to minimize interceptions or the intercepted conversations that contained personal, non-criminal matters. The brief only vaguely refers to "a number of conversations" that "includ[ed] personal, non-criminal matters." Because Colbert provides no evidence, he cannot satisfy his burden of proof regarding minimization. *See United States v. Giacolone*, 853 F.2d 470, 482 (6th Cir. 1988) (holding that defendants who "did not give any specific examples of conversations which should not have been monitored" failed to satisfy their initial burden when challenging minimization procedures and impermissibly their burden to the government); *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986) ("The burden of production and persuasion rests on the person seeking to suppress evidence."). The district court thus appropriately rejected Colbert's argument.

### C. Jeremy Duncan

### 1. Necessity

Jeremy Duncan challenges Application #6 on the basis of necessity. Beyond the already-discussed allegations of boilerplate language and the failure to exhaust traditional investigative techniques, Duncan raises an additional necessity argument: he claims that agents had to exhaust traditional investigative methods with respect to each individual particular interceptee or target.

This circuit has no published decisions explicitly addressing whether necessity must be shown with regard to each particular interceptee or investigatory target. *But see United States v.*

*Sherrills*, 432 F. App'x 476, 481 (6th Cir. 2011) (determining that even though an affidavit concerned his co-defendant, there was "no reason" to exclude the applicability of that affidavit to the defendant because, "[v]iewing the affidavit as a whole," the targeted telephone was linked to a "high volume of calls made to other numbers associated with individuals known or suspected of drug trafficking"). We hold that necessity must be shown only for the investigation as a whole, not for each interceptee or target.

We begin with the words of the statute and attribute to them their ordinary, contemporary, and common meaning. *United States v. Plavcak*, 411 F.3d 655, 660 (6th Cir. 2005). Title III's necessity provision requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). After reviewing that statement, the issuing judge may issue an interception order if satisfied that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). These provisions speak only of "investigative procedures" and say nothing of "individuals," "targets," or "interceptees." This language suggests that the issuing judge must analyze the necessity of a wiretap within the context of the investigation as a whole, not in relation to individual targets or interceptees. It also accords with the directive that courts judge the evidence in the affidavit based "on the totality of the circumstances and in a reasonable and common sense manner." *Alfano*, 838 F.2d at 161. Other circuits have adopted this reading. *See, e.g.*, *United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009) ("[T]he necessity requirement is directed to the objective of the investigation as a whole, and not to any particular person. If the Government can demonstrate that ordinary investigative techniques would not disclose information covering the scope of the drug

trafficking enterprise under investigation, then it has established necessity for the wiretap.");

*United States v. Mitchell*, 274 F.3d 1307, 1312 (10th Cir. 2001) (concluding that necessity did

not have to be established "as to all named interceptees"). As explained above, the affidavit in

support of Application #6 satisfied necessity as to the investigation as a whole. Duncan's

argument therefore fails.

## 2. Probable Cause

Duncan alleges that the affidavit in support of Application #6 failed to establish probable

cause that he was involved in drug trafficking, linking him to the conspiracy on the basis of only

three phone calls between him and the investigation's other targets.

As the district court explained, however, when placed in context, these intercepted

conversations revealed that Duncan was participating in a drug conspiracy. In his affidavit, SA

Porrini explained:

> With regard to the TREGGS DTO, DANTE L. BRANCH and ANTHONY L.
> TREGGS were intercepted in a telephone conversation over [Branch's wiretapped
> phone] on January 30, 2012, in which TREGGS advised BRANCH that he would
> be in town (Akron) during that week. Later that same day, JEREMY S.
> DUNCAN, a courier for TREGGS, was intercepted over [Branch's phone].
> DUNCAN advised BRANCH that he was in town and wanted to meet with
> BRANCH. BRANCH met with DUNCAN at "the Club," a warehouse located at
> 1074 Bank St., Akron, OH. Based on intercepted conversations between
> BRANCH, using [his phone], and DERRICK WATSON, using [his phone], it
> was apparent that DUNCAN dropped off an unknown, multi-pound quantity of
> marijuana to BRANCH and WATSON. Additional intercepted telephone
> conversations suggested BRANCH was expecting another shipment from
> TREGGS/DUNCAN during the second or third weeks of March. Intercepted calls
> over [three wiretapped telephones] indicated that BRANCH, WATSON,
> DUNCAN and [UNKNOWN CONSPIRATOR] arranged for a shipment of an
> unknown amount of marijuana from California to Akron, OH that arrived in
> Akron on March 29, 2012. Surveillance units observed BRANCH and DUNCAN
> meet at 1074 Bank St., Akron, OH to complete the delivery. Additionally on April
> 06, 2012, TREGGS was intercepted over [Branch's phone] advising BRANCH
> (who was in California, visiting with TREGGS' father) to come to his residence,
> "I got something for you." TREGGS then asked his father to show BRANCH

what TREGGS had given to his father (marijuana) and advised, "I got a whole
lot."

SA Porrini believed and so stated in his affidavit that these conversations, coupled with his experience and observations, evidenced participation in drug trafficking by Duncan. The district court properly concluded: "The affidavits reveal that Porrini was an extremely experienced and accomplished narcotics investigator who could reliably interpret the conversations. [The issuing judge] acted within his discretion in accepting the Agent's interpretations of the calls." *See United States v. Caicedo*, 85 F.3d 1184, 1192-93 (6th Cir. 1996) (holding that probable cause supported a search warrant because the affiant's interpretation of illegal behavior was entitled to deference in light of the affiant's "15 years' experience in law enforcement generally and at least seven years' experience specifically in narcotics investigations"). Accordingly, the district court had a substantial basis from which to determine probable cause existed.

### D. Wesley Black

### 1. Necessity

Wesley Black contends that Application #3 through Application #6 failed to demonstrate necessity. Essentially, he repeats the arguments made by the aforementioned Defendants. His claims thus lack merit.

Black also asserts that the supporting affidavit for Application #3 contained materially false statements concerning the use of confidential sources, the futility of search warrants, and Darryl Colbert's use of an alias. In his original suppression motion, however, Black raised only the claims made by Darryl and Dale Colbert. But neither Darryl nor Dale Colbert alleged the false statements Black identifies. Consequently, Black cannot advance these claims for the first time on appeal. *See Lopez-Medina*, 461 F.3d at 738.

### 2.  Franks Hearing

Black argues that a *Franks* hearing was warranted for false statements regarding the use of confidential sources and the efficacy of obtaining a search warrant.  Because Black never raised these arguments in his suppression motion, he cannot raise them on appeal. *Id.*

### E.  Darin Wright

Darin Wright challenges Application #5 on the basis of necessity, repeating arguments made by other Defendants.  As explained above, the affidavit in support of Application #5 established necessity, so Wright's claim lacks merit.

### F.  Antowan Logan

Antowan Logan asserts that Application #3 and Application #4 did not establish necessity, restating the previous arguments.  For aforementioned reasons, both of these wiretap applications satisfied the statutory necessity requirement.

Logan further advances an individualized argument, claiming that necessity was not satisfied as it related to *him* specifically because he was a regional, low-level participant in the drug conspiracy who was not a significant target of the investigation.  Logan, however, waived this particular argument.  His motion below generically challenged "the affidavits" for containing boilerplate language and failing to establish necessity, but he never asserted his role in the conspiracy affected the necessity calculus.  This argument cannot be raised for the first time on appeal. *See Lopez-Medina*, 461 F.3d at 738.

### II.  Guilty Plea

Antowan Logan separately argues that his guilty plea was neither knowing nor voluntary because the district court misstated the quantity of cocaine he was charged with trafficking during the plea colloquy, and Logan's plea agreement mentioned varying amounts of

cocaine. Specifically, Logan claims that during his plea colloquy, the district court made reference to 500 grams of cocaine, even though Logan was charged with conspiring to distribute and to possess with intent to distribute five kilograms or more of cocaine. Logan further states that his plea agreement contained "conflicting information" that "mudd[ied] the waters even further," simultaneously referencing 500 grams of cocaine as well as "between three and a half and five" kilograms of cocaine.

"A guilty plea is valid if it is entered knowingly, voluntarily, and intelligently by the defendant." *United States v. Dixon*, 479 F.3d 431, 434 (6th Cir. 2007); *see also Brady v. United States*, 397 U.S. 742, 748 (1970). Under Federal Rule of Criminal Procedure 11, a district court must confirm that "the defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual basis for concluding that the defendant committed the crime charged." *United States v. Webb,* 403 F.3d 373, 378-79 (6th Cir. 2005) (citing *United States v. Goldberg,* 862 F.2d 101, 106 (6th Cir. 1988)); *see also* Fed. R. Crim. P. 11(b)(1)-(3).

Because Logan failed to object contemporaneously to the district court's alleged failure to comply with the requirements of Rule 11, this court reviews only for plain error. *Webb*, 403 F.3d at 378. "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (citations omitted).

A review of the record indicates that the district court did not plainly err in accepting Logan's guilty plea. The references to both five kilograms and 500 grams of cocaine can be

explained by the statutory scheme under which Logan was convicted. The superseding indictment charged Logan with three counts, including conspiring to distribute and to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A). However, as the plea agreement specified, the United States agreed to attribute less than five kilograms, but at least three and a half kilograms, to Logan's personal role in the conspiracy. This removed Logan's conduct from the statutory penalty provision associated with 5 kilograms or more of cocaine, 21 U.S.C. § 841(b)(1)(A), to the next rung of the sentencing ladder, the statutory penalty provision associated with 500 grams or more of cocaine, 21 U.S.C. § 841(b)(1)(B)(ii). Logan thus agreed to plead guilty to conspiracy to distribute and to possess with the intent to distribute 500 grams or more of cocaine. However, as his plea agreement explained, because Logan had two prior felony drug convictions, he was subject to a sentencing enhancement under 21 U.S.C. § 851(a)(1) that guaranteed he would face between 10 years and life imprisonment.

Logan's plea colloquy reflected that he understood his constitutional rights, the nature of the crime charged, the consequences of the plea, and the factual basis for concluding that he committed the crime charged. The district court explicitly stated that Logan was "charged with having conspired to distribute and to possess with the intent to distribute 500 grams or more of cocaine" and would "face a mandatory minimum of at least 10 years of incarceration" on that count. Immediately after, the district court asked Logan whether he understood the "nature" of the crime he was charged with and the penalty he would face. Logan responded, "Yes." The district court then detailed every constitutional right available to Logan, who affirmed that he understood and agreed to relinquish each right. Logan further attested that he read, understood, and signed the plea agreement. These facts indicate that the guilty plea was knowing and

voluntary. *See Brady*, 397 U.S. at 756 (determining that plea was knowing and voluntary when defendant "was advised by competent counsel, he was made aware of the nature of the charge against him, and there was nothing to indicate that he was incompetent or otherwise not in control of his mental faculties"); *see also United States v. McIntyre*, 445 F. App'x 830, 832 (6th Cir. 2011) (holding that plea was knowing and voluntary when defendant "acknowledged that he had reviewed the[] [indictment and plea agreement] with his attorney and that he understood the terms and conditions of the plea"). Accordingly, Logan's guilty plea was knowing and voluntary.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.