RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DONALD BERNARD GARDNER (20-1118); MARTINELLUS NIX (20-1170); RYAN RASHAD BROWN (20-1260); DOUGLAS EMMANUEL CAREY, III, (20-1265); MARVIN QUANTEZ NIX (20-1266); SALENA E. KOLARICH (20-1272),

*Defendants-Appellants*.

Nos. 20-1118 /1170 /1260 /1265 /1266 /1272

⎤
⎟
⎟
⎟
⎟
⎟
⎟
⎟
⎟
⎟
⎦

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cr-00167-8—Paul Lewis Maloney, District Judge.

Argued: October 21, 2021

Decided and Filed: April 25, 2022

Before: McKEAGUE, NALBANDIAN, and MURPHY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Mary Chartier, CHARTIER & NYAMFUKUDZA, P.L.C., Okemos, Michigan, for Appellant in 20-1265. Daniel T. McGraw, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Mary Chartier, CHARTIER & NYAMFUKUDZA, P.L.C., Okemos, Michigan, for Appellant in 20-1265. Michael J. Manning, MANNINGLAW, Escanaba, Michigan, for Appellant in 20-1118. Lawrence J. Phelan, Walker, Michigan, for Appellant in 20-1170. John M. Karafa, GRAVIS LAW, PLLC, Muskegon, Michigan, for Appellant in 20-1260. Daniel R. Fagan, DANIEL R. FAGAN & ASSOCIATES, P.C., Grand Rapids, Michigan, for Appellant in 20-1266. Mark Louis Dobias, MARK L. DOBIAS, P.C., Sault Ste. Marie, Michigan, for Appellant in 20-1272. Daniel T. McGraw, Kate Zell, Kathryn Dalzell, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

———————————

**OPINION**

———————————

NALBANDIAN, Circuit Judge.   This case is about a drug-trafficking conspiracy that distributed more than 100 kilograms of powder and crack cocaine in Southwest Michigan from 2017 to 2018.  The conspiracy involved dozens of actors across the states of Michigan, Texas, and Arkansas.  But only eight members of the operation play a relevant role here.  The first, Howard Mayfield, served as the Grand Rapids-based ringleader of the drug-trafficking organization.  The second, Wilbert Gentry, supplied Mayfield from Houston, Texas, with kilogram quantities of cocaine.  The next six players—Donald Gardner, Martinellus Nix, Ryan Brown, Douglas Emmanuel Carey, Marvin Nix, and Salena Kolarich—acted as money couriers, wholesale distributors, and street-level dealers in the Grand Rapids area.

Federal prosecutors indicted a grand total of 27 coconspirators in 2018.  And all were convicted for their various roles in the conspiracy.  These appeals are brought by six of those coconspirators—Gardner, Brown, Carey, Kolarich, Marvin Nix, and Martinellus Nix.  Together, their consolidated appeals present 17 issues, ranging from the denial of their motions to suppress wiretap evidence to sentencing errors.  We take each in turn, affirming the district court on all but one issue.

I.

*The Investigation.*  Howard Mayfield ran a drug-trafficking organization out of Grand Rapids, Michigan.  His operation dealt powder and crack cocaine in and around the area. Wilbert Gentry, an old cellmate of Mayfield's, supplied the organization with cocaine from his base in Houston, Texas.  Starting in the spring of 2017, Mayfield received around five kilograms of cocaine from Gentry each month.  Sometimes the amount varied—once Mayfield received 15 kilograms from Gentry.  Sometimes Gentry supplied Mayfield more than once a month.  And sometimes Mayfield met Gentry in Houston to exchange cocaine and payment, although other times he met one of Gentry's couriers in Arkansas.  All in all, Mayfield's operation managed to move hundreds of kilograms of cocaine in 2017 and 2018.

But Mayfield's drug-trafficking ring wasn't the only clandestine operation in town. Agents at the Drug Enforcement Agency (DEA) caught wind of Mayfield's organization right before Gentry entered the picture. They launched an investigation soon after, partnering with law enforcement agencies across the country to slowly piece together a picture of the operation. Together, the agencies used many traditional techniques—including confidential sources, controlled buys, phone record analysis, and physical surveillance—to gather information. And they had some success. Investigators, for instance, learned the identities of people associated with Mayfield, gathered physical evidence that Mayfield dealt cocaine, and knew the identity of Gentry.

But after a year of work, the investigation stalled. Confidential sources dried up. Physical surveillance couldn't follow suspects into apartment buildings. And toll record and pen register requests struggled to keep pace with rotating burner phones. So despite some initial success, investigators still missed key pieces of the puzzle. True, they had identified a few suspects close to Mayfield. But they didn't know the scope of the suspects' roles or if they even worked for the operation in the first place. In short, investigators had enough evidence to prosecute Mayfield and Gentry, but not enough to dismantle the whole organization.

So on March 13, 2018, investigators sought authorization to wiretap one of Mayfield's phones (Target Phone 1). In support, they filed an 87-page affidavit that described how Mayfield used the phone, why interception was necessary, and what techniques had been "tried and [had] failed to fully achieve the goals and objectives of [the] investigation." (R. 2, pp. 79–99.) The district court signed an order authorizing interception for an initial 30-day period that same day. About a month later, the district court signed an order for another 30-day wiretap on the same phone. But soon after, investigators realized Mayfield had started to use a new phone (Target Phone 2) to communicate with his cocaine suppliers and distributors. So they put in an application to tap that phone too, which the district court approved on May 1, 2018.

The wiretaps served their purpose. Investigators paired intercepted communications with continued physical and electronic surveillance. Together, the evidence painted a detailed picture of Mayfield's organization. This picture revealed the scope of each coconspirators' role. Brown

and Gardner served as retail distributors of cocaine for Mayfield. Both communicated with Mayfield about shipments, suppliers, and deals. Carey and the Nix cousins, for their parts, filled out the roster as street-level dealers. And Kolarich, Gentry's girlfriend, collected $50,000 in cash cocaine proceeds from Mayfield in a parking-lot exchange. She personally transported some of the money to Gentry and asked friends to help her wire the rest.

Armed with the wiretap evidence, investigators launched a coordinated takedown on May 24, 2018. That day, they arrested and charged 15 members of Mayfield's operation—including Mayfield, Gardner, Gentry, and Brown. Soon after, the grand jury indicted 27 defendants, including Martinellus Nix, Marvin Nix, Carey, and Kolarich, with conspiracy to distribute and possess cocaine, along with substantive counts for each of the defendants' drug-related activities.

All but four of the 27 defendants pleaded guilty. Gardner took this path, pleading guilty to conspiring to distribute and possess with the intent to distribute cocaine or cocaine base. Martinellus Nix did the same, pleading guilty to possession with intent to distribute cocaine. The other four defendants—Brown, Carey, Marvin Nix, and Salena Kolarich—proceeded to trial.

*Trial and Sentencing Proceedings.* At trial, the government introduced testimony from many witnesses. Investigators testified about their participation in the takedown of the drug-trafficking ring. Expert witnesses explained the code words and street slang used in intercepted calls and texts. Voice-identification witnesses identified the defendants' voices on intercepted calls. And cooperating codefendants, like Gentry, gave in-depth descriptions of the organization's operations. The government's evidence also included drugs bought from Mayfield, intercepted cocaine, bank records, phone records, residency records, and electronic evidence from GPS tracking devices. The real star of the show, though, was the wiretap evidence. The government played intercepted phone calls between Mayfield and each of the defendants. It also introduced pages of text messages that discussed drug dealing, cocaine shipments, and cocaine-supply issues.

In the end, the jury convicted all four defendants. Each was convicted on the cocaine conspiracy charge. The jury also convicted Brown, Carey, and Marvin Nix of separate counts of possession with intent to distribute cocaine or cocaine base. And it convicted Kolarich for

unlawful use of a communication facility to enable the cocaine conspiracy, along with interstate travel to distribute the conspiracy's drug proceeds.

The district court then sentenced Gardner to 168 months, Martinellus Nix to 120 months, Marvin Nix to 96 months, Carey to 150 months, Brown to 204 months, and Kolarich to 60 months' imprisonment.

All six defendants appealed, raising 17 issues in total. We address their arguments in three parts. First, we consider the district court's denial of the defendants' motion to suppress the wiretap evidence. Next, we turn to evidence issues from the trial. Last, we take up the defendants' sentencing challenges.

## II.

The standard of review for a district court's denial of a motion to suppress is familiar. We review findings of fact for clear error and questions of law de novo. *United States v. Young*, 847 F.3d 328, 342 (6th Cir. 2017). But in cases about motions to suppress wiretap evidence, there's a twist. This is because we consider the orders of two different district court judges: (1) the *issuing* district court judge, who authorizes the government's use of wiretaps in the first place; and (2) the *reviewing* district court judge, who either grants or denies a defendant's motion to suppress the wiretap evidence.

The distinction between the issuing and the reviewing district court judge is key to this appeal. All the defendants, except Kolarich, challenge the district court's denial of the motion to suppress evidence from the three wiretap applications. But they do so for two distinct reasons. First, each defendant makes the same substantive challenge: They believe the government failed to meet the Title III necessity requirement for wiretaps. This argument attacks the *issuing* district court's determination that the government satisfied that requirement. Second, only one of the defendants, Martinellus Nix, makes a procedural challenge. He argues the *reviewing* district court abused its discretion when it considered only two of the three wiretap applications.

We review the substantive challenge with fresh eyes and ask if the issuing district court abused its discretion when it authorized the wiretaps. *United States v. Wright*, 635 F. App'x 162,

165 (6th Cir. 2015); *see also United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (noting that we "accord 'great deference' to the determinations of the issuing judge" (quotation omitted)).  As for the procedural challenge, Martinellus Nix failed to raise his argument below. So we review for plain error.  *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015).

*Substantive Challenge.*   Before the government can wiretap a suspect's phone, it must satisfy Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510– 2520.  Title III imposes a heightened warrant requirement for government wiretaps.  Not only must the government show probable cause, *see* 18 U.S.C. § 2518(3), but it also must satisfy the "statutory 'necessity requirement.'"  *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting *United States v. Alfano*, 838 F.3d 158, 163 (6th Cir. 1988)).  The necessity requirement mandates that every wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).

Typically, we affirm an issuing judge's necessity finding when a wiretap application meets three criteria.  First, the government can't use a wiretap as "the initial step."  *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)).  Second, investigators shouldn't resort to wiretapping in circumstances "where traditional investigative techniques would suffice to expose the crime."  *Id.* at 19–20 (quoting *United States v. Kahn*, 415 U.S. 143, 153 (1974)).  Third, although officials may rely on "prior experience," they must apply those experiences to the "particular facts of the case at hand[.]"  *Id.* at 20.  As explained below, the wiretap applications here meet all three criteria.

*1. Initial Step.*  Investigators didn't use wiretaps as an initial, or even an intermediate, step.  Instead, they spent more than a year diligently using traditional techniques.  Still, after a full year of working with confidential sources, executing controlled buys, using pen registers and toll records, installing GPS tracking devices, engaging in physical surveillance, and watching pole camera footage, the government lacked key pieces of the drug-trafficking puzzle.  To be sure, these techniques established the existence of Mayfield's organization, identified Gentry as a cocaine supplier, and found new target subjects.  But investigators wanted to discover enough

evidence to dismantle the entire organization and "fully prosecute all members," not just arrest a few participants. In a litany of cases, this Court has affirmed the use of wiretaps in similar circumstances.[1] This is because "nothing requires the government to call off its investigation after it achieves only some of its goals." *United States v. Castro*, 960 F.3d 857, 864 (6th Cir. 2020). Here, investigators waited an appropriate time, one year, to apply for wiretaps that fulfilled an appropriate goal, taking down the whole drug-trafficking ring. So the wiretap requests were far from an initial step.

A few defendants disagree. In his brief, Carey argues "[t]here was a rush to get access to phones instead of pursuing the investigation through more conventional means . . . ." (Carey Br. at 3.) Gardner makes a similar argument. The record doesn't support their position. Investigators didn't rush or jump to wiretapping. Instead, they applied for wiretaps after a year of using traditional tools.

Two defendants, Brown and Marvin Nix, make a more nuanced argument. They contend that the wiretaps counted as an initial step against them. In their view, Title III requires the government to use traditional investigative techniques against each suspect before resorting to wiretapping. But Brown and Marvin Nix aren't the first defendants to make these kinds of arguments. In *United States v. Jenkins*, the defendants similarly claimed "investigators were required to pursue traditional methods of investigation into the activities of all named interceptees in each wiretap application." 659 F. App'x at 335. But we rejected this argument, pointing out that the defendants cited "no authority holding the government is required to exhaust traditional methods of investigation into all possible members of a conspiracy before applying for a wiretap." *Id.*

---

[1]*See Young*, 847 F.3d at 345 (rejecting the defendant's argument that some objectives, like arresting certain members, could have been met without wiretapping when the investigation's main objective was dismantling the entire operation); *Stewart*, 306 F.3d at 304–06 (same); *United States v. Gonzalez*, 849 F. App'x 557, 562–63 (6th Cir. 2021) (finding use of a wiretap appropriate when the government wanted to understand the scope of a drug-trafficking conspiracy and identify every member); *United States v. Jenkins*, 659 F. App'x 327, 335 (6th Cir. 2016) (same). On a similar note, we've also recognized that "wiretapping is particularly appropriate" in narcotics conspiracy investigations because "the telephone is routinely relied on to conduct the criminal enterprise." *Stewart*, 306 F.3d at 305 (quoting *Landmesser*, 553 F.2d at 20).

The same holds true here.  In this case, investigators exhausted traditional investigative tools without gathering enough evidence to dismantle the organization.  And it applied for a wiretap to "identify[] other key personnel."  (R. 2, p. 196.)  That it did so successfully does not mean it impermissibly used wiretaps as an initial step against newly identified members.

*2. Use of Traditional Techniques.*     Title III's necessity requirement ensures that investigators don't resort to wiretapping in circumstances "where traditional investigative techniques would suffice to expose the crime." *Landmesser*, 553 F.2d at 19–20 (citation omitted).  To satisfy the requirement, though, investigators "need not prove the impossibility of other means of obtaining information." *Stewart*, 306 F.3d at 305.  Instead, the government need only "give serious consideration to the non-wiretap techniques" so "that the court [is] informed of the reasons . . . non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163–64 (quoting *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985)).

That's exactly what the government did here.  In each of the three wiretap applications, investigators' supporting affidavits described why traditional "investigative procedures have been tried and failed," appeared "unlikely to succeed," or seemed "too dangerous." *See* 18 U.S.C. § 2518(1)(c).  The level of detail showed officers didn't resort to wiretapping where traditional techniques would have sufficed.  Each affidavit listed the traditional techniques investigators had tried before and explained why those techniques wouldn't reveal the scope of the entire drug-trafficking conspiracy.  Each incorporated new information into its investigative history.  And each described why investigators still needed wiretap evidence.  All in all, the three affidavits showed the government "g[ave] serious consideration to the non-wiretap techniques." *Alfano*, 838 F.2d at 163–64 (internal quotation omitted).

The defendants make several counterpoints, none convincing.  Three argue that the government's initial success with traditional techniques and "fail[ure] to pursue additional viable [methods]" "obviated the *need* for wiretaps."  (Gardner Br. at 39, 41; *see also* Brown Br. at 19; Marvin Nix Br. at 13.)  Gardner, for example, focuses on warrants.  He contends that the government should have used search warrants "before seeking further wiretaps like the tap of Phone 2."  (*Id.* at 32.)  But this argument ignores the reality that search warrants would have

exposed the covert operation.  True, the government used residential search warrants "just three weeks after" it received authorization to tap Target Phone 2.  (*Id.*)  But it executed those warrants at the end of the investigation.  Besides, this Court has never held the government must try traditional techniques that would "alert other members of the conspiracy of the investigation." *Gonzalez*, 849 F. App'x at 562; *see also Wright*, 635 F. App'x at 167.

For his part, Martinellus Nix attacks the third wiretap application.  He argues that the government presented insufficient new information to "justify" that last tap into Target Phone 2. (*See* Martinellus Nix Br. at 22–23.)  Gardner makes an adjacent argument.  He asserts that the second and third wiretap applications didn't "differ remarkably" from the first.  (Gardner Br. at 27.)

Two points in response.  First, the defendants ignore the reams of fresh evidence the government presented in the second two applications.  Second, when an investigation merits multiple wiretaps, a later application often will resemble an earlier one.  After all, "the surveillance techniques" found inadequate during one part of the investigation will often be futile for "similar reasons" later.  *United States v. Sims*, 508 F. App'x 452, 459 (6th Cir. 2012); *see also Corrado*, 227 F.3d at 539 (rejecting the defendants' assertion that further electronic surveillance was unwarranted because the government had gathered a "large quantum of evidence" and had other "available investigative techniques" at its disposal).

*3. Case-Specific Support.*   Last, we consider the use of case-specific support. Investigators may rely on "prior experience" to explain why traditional techniques appear unlikely to succeed or seem too dangerous.  *Landmesser*, 553 F.2d at 20.  But they must relate those experiences to the particular facts of the investigation at hand. *See Wright*, 635 F. App'x at 167.  This means that an affidavit may "rest[] in part on statements equally applicable" to similar investigations as long as it ties those statements to case-specific examples.  *Landmesser*, 553 F.2d at 20 (citation omitted).  Without those examples, an affidavit falls short of the necessity mark.  *See, e.g.*, *United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007) (affirming the suppression of wiretap evidence where the affidavit contained generalized, uncorroborated information about necessity and no case-specific support).

Here, the three affidavits pass the test.  Although each affidavit contains a few general conclusions, specific examples provide support along the way.  For instance, the first affidavit makes general assertions about the limitations of physical surveillance.  But it doesn't leave it at that. Instead, it follows with specific examples of why those limitations proved true in the investigation of Mayfield's organization.  This pattern repeats itself in each affidavit and for every traditional technique.

The defendants disagree.  They argue the wiretap affidavits relied on generalized, boilerplate conclusions that apply to "all drug-trafficking-organization investigations." (Gardner Br. at 29–30.)  And in their view, these "boilerplate" recitations render the wiretap applications inadequate.  (Carey Br. at 46–47; *see also* Brown Br. at 9; Marvin Nix Br. at 13.)

But each boilerplate argument suffers from one of three analytical flaws.  First, the defendants fail to contend with the case-specific support included in each wiretap affidavit. Second, they overstate the Title III requirement.  Third, they rely on inapposite precedent.

Start with the failure to contend with case-specific support.  Defendants point to an example of a generalized conclusion, cry "boilerplate," and rest their case.  But their analysis ignores the detailed, case-specific information that follows most references to the investigator's experience.  Take Gardner's brief.  He asserts that the government's discussion of physical surveillance, confidential sources, and trash pulls rest on the same "boilerplate conclusions." (Gardner Br. at 29, 30, 35–36, 40.)  But for each technique, the affidavits tell a different story.  In fact, each affidavit provides pages of analysis explaining why, in this specific case, physical surveillance, confidential sources, and trash pulls didn't work or proved too risky.

Next, defendant's overstate Title III's requirement.  For instance, Gardner recognizes the government made some "assertions specific to the investigation." (Gardner Br. at 36.)  Still, he believes the fact that "one [could] make similar assertions in most multi-defendant drug cases" negates necessity even in the presence of case-specific support.  (*Id.*)  But Title III doesn't require investigators to show why one drug investigation is unique or distinguishable from all others.  Rather, it tells the government to prove why, in that specific case, certain traditional techniques have "been tried or failed" or appeared "unlikely to succeed."  *See* 18 U.S.C.

§ 2518(1)(c); *see also United States v. Wren*, 528 F. App'x 500, 504–05 (6th Cir. 2013) (explaining that the affidavit, when read as a whole, supported a necessity finding even though it included some language that could apply to most narcotics investigation).  And in all three applications, the government did just that.

One last note.  Defendants compare this case to *United State v. Rice*, one of our precedents, and *United States v. Blackmon*, a Ninth Circuit case.  Neither is on point.  In *Rice*, the district court determined that the affidavit contained "misleading" and "reckless" statements. 478 F.3d at 707–09.  It found that without the misleading statements, only "uncorroborated thoughts and opinions" remained. *Id.* at 709.  This meant the affidavit provided "no evidence that any other investigative technique was . . . seriously considered."  *Id.*  So it suppressed the evidence.  We agreed with its analysis and affirmed.  *Id.* at 710.  In *Blackmon*, the Ninth Circuit made a similar move.  273 F.3d 1204 (9th Cir. 2001).  It found the wiretap application contained "material omissions" and "generalized statements that would be true of any narcotics investigations."  *Id.* at 1208.  Without "specific facts," the Ninth Circuit held that "boilerplate conclusions" alone could not justify necessity.  *Id.* at 1208–10.

This case is not like *Rice* or *Blackmon*.  Defendants don't allege that the affidavits contain misleading or false statements.  Nor do they identify material omissions.  What's more, investigators identified multiple case-specific "examples of actual investigative techniques that had already been used" and would serve "limited value going forward."  *See Sims*, 508 F. App'x at 457 (distinguishing *Rice*).

\* \* \*

In sum, each wiretap application met Title III's necessity standard.  The investigators didn't use the wiretaps as an initial step.  They provided detailed explanations as to why traditional investigative techniques failed to expose the entire scope of the drug-trafficking enterprise.  And they gave fresh, case-specific examples in each application.  For these reasons, we affirm the issuing district court judge's finding of necessity for all three wiretaps and the reviewing district court judge's denial of the motion to suppress.

*Procedural Challenge.*  Only one of the defendants, Martinellus Nix, makes a procedural challenge.  He claims that the reviewing district court erred when it considered the first two wiretap applications in its denial order, but not the third.  Failure to explicitly consider the third application, Nix asserts, qualifies as an abuse of discretion.  And given the lack of evidence "implicating him on the first two wiretaps," Nix believes this omission "prejudiced" him and mandates reversal. (Martinellus Nix Br. at 13.)  Nix is right about one thing.  Although the district court's order explains why the first and second wiretap applications satisfied the necessity requirement, the third application goes unmentioned.

Still, we need not reach his procedural challenge.  We review the issuing judge's necessity finding for each wiretap application with fresh eyes.  *Wright*, 653 F. App'x 165.  This means we ask the same question the reviewing judge did below:  Did the issuing judge abuse his discretion when he found each of the wiretap applications established the requisite necessity?

Our answer for the third application?  No.  The third application, like the first two, satisfied Title III's necessity requirement.  So even if the reviewing district court erred in omitting the last application, we decline to remand the issue just so it might receive another look. Put another way, our answer to the substantive question in this case—whether the third wiretap application satisfied the necessity requirement—precludes our need to consider the procedural one. *Accord United States v. Rodriguez*, 851 F.3d 931, 939 (9th Cir. 2017) (declining to remand the wiretap issue, despite a district court's procedural error, because it conducted the same necessity inquiry on appeal).

III.

Carey, Brown, Marvin Nix, and Kolarich make various challenges to the evidence presented at trial.  Some attack the admission of expert testimony.  Others dispute the sufficiency of the evidence to give jury instructions or convict.  We address the issues one by one.

*Agent Burns's Daubert Hearing.*  Carey claims that the district court erred when it denied his *Daubert* hearing motion for one of the government's expert witnesses, DEA Agent Thomas Burns.  We review a district court's decision to admit or exclude expert testimony for abuse of discretion. *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 528 (6th Cir. 2008).  But even if

we find such abuse, we won't reverse unless the error affected a party's substantial rights. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007).

Carey's argument ignores a crucial fact: The government didn't call Burns as a witness at trial. And Carey never explains how, without testimony from Agent Burns, the district court's ruling affected his substantial rights. Instead, he focuses on the merits of the district court's *Daubert* call. This omission dooms his claim. Even if we agreed with Carey on the merits, any error would be harmless because Agent Burns never testified. *See* Fed. R. Evid. 103(a); *White*, 492 F.3d at 404–08. For this reason, we affirm the district court's denial of Carey's motion for a *Daubert* hearing.

*Agent Labno's Expert Testimony.* Carey, Brown, and Marvin Nix challenge the expert testimony of ATF Agent Christopher Labno. At trial, Agent Labno deciphered code words and street slang used in the defendants' intercepted calls and texts. The defendants objected on two grounds to the admission of Agent Labno's testimony: (1) his qualifications and (2) his testimony's relevance. Because they raised these arguments at trial, we review their challenges for abuse of discretion. *United States v. Dunnican*, 961 F.3d 859, 875 (6th Cir. 2020).

We consider the qualifications first. Agent Labno served as a special agent on the ATF's drug-trafficking task force more than 18 years, participating in at least 150 investigations. This work involved purchasing various narcotics, including powder and crack cocaine, in undercover operations across the United States. Given his extensive experience, Agent Labno was more than qualified to testify about drug-trafficking-street slang.

This conclusion tracks with our caselaw. We have routinely found "law enforcement officers" qualify as "expert witnesses" when they "interpret intercepted conversations that use slang, street language, and the jargon of the illegal drug trade." *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) (internal quotations omitted); *see also United States v. Lopez-Medina*, 461 F.3d 724, 743 (6th Cir. 2006) (holding that 17 years of DEA employment, along with extensive narcotics-investigation training and experience, qualified a DEA agent to give expert testimony); *United States v. Toland*, 717 F. App'x 560, 565–66 (6th Cir. 2017) (same for

an agent with 11 years of experience).  These cases are on all fours here. Agent Labno's 18 years of experience qualified him to serve as an expert witness.

We take up the relevance of his testimony next.  Under Federal Rule of Evidence 702, expert testimony must help "the trier of fact to understand the evidence or determine a fact in issue."  This helpfulness standard "goes primarily to relevance."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).  In case after case, we have held that testimony from law enforcement officers like Agent Labno is relevant.  The "average juror," after all, has little experience with cryptic "drug dealing" slang.  *Dunnican*, 961 F.3d at 875–76 (quotation omitted); *see also Lopez-Medina*, 461 F.3d at 742; *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1995), *abrogated on other grounds by Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997). For instance, in this case, Agent Labno explained drug-trafficking terminology like "hizzy," "soft," "zone," "diamonds," "shake," "whole onion," and "zip"—words unfamiliar to an ordinary person.  (R. 1247, PageID 12755–70.)  So his testimony was relevant.

The defendants push back.  Agent Labno, they protest, never worked in the Grand Rapids area and misinterpreted words.  They also point out that Agent Labno admitted that some slang depends on context.  As they see it, that admission showed "there was nothing that Agent Labno could offer the jury." (Carey Br. at 31.)  We disagree.  Defendants' objections go to the weight of Agent Labno's testimony, not its admissibility.  And their own questioning of Agent Labno at trial proves this point.  There, Agent Labno conceded he never worked in Grand Rapids or on the investigation, that slang varied across regions, and that he spoke with colleagues about Grand Rapids slang before the trial.  The jurors heard these concessions and considered them.  So we decline to step into their shoes and reweigh the accuracy of Agent Labno's testimony now.  We affirm the district court's admission of Agent Labno's expert testimony.

One final point.  The defendants suggest the district court should have held a *Daubert* hearing for Agent Labno.  But no defendant requested such a hearing. In fact, at the pretrial motion hearing about Agent Burns's testimony, one defense counsel favorably cited the government's witness disclosure statement for Agent Labno.  "[T]he information that we received on Agent Labno," he explained, "is exactly the information that we were seeking on

Agent Burns."  (R. 1256, PageID 13699.)  With no request for a *Daubert* hearing in the record, the defendants cannot claim error now.

*Lay Witness Voice Identification.*  Carey also argues that the district court erred when it allowed four lay witnesses to identify his voice on intercepted calls.  Three of the witnesses—Wilbert Gentry, Officer Thomas Mize, and Sergeant Gregory Alcala—had spoken with Carey in person.  Mize served as Carey's probation officer, often visiting Carey at his home and speaking to him on the phone.  Sergeant Alcala visited Carey's residence not long before the trial, talking to Carey both outside his home and on the phone.  And Gentry, Carey's codefendant, spoke with Carey many times in jail.  The fourth witness, Detective Danny Wills, had spent hundreds of hours listening to the intercepted calls in real-time, learning Carey's voice as he monitored discussions.

Carey presents two general concerns—one preserved and one forfeited—about the voice-identification witnesses.  First, the preserved argument. Carey contends that voice identifications require an expert witness.  We review this claim for abuse of discretion. *United States v. Pryor*, 842 F.3d 441, 451 (6th Cir. 2016).  Next, the point he didn't raise at trial.  Carey suggests all four defendants were too unfamiliar with his voice to make reliable identifications.  We review this argument for plain error. *United States v. Martin*, 520 F.3d 656, 658 (6th Cir. 2008).

The standard of admissibility for an "opinion identifying a person's voice" is a low one. Fed. R. Evid. 901(b)(5).  If the identifying witness has "heard the voice of the alleged speaker at *any* time," his testimony is admissible.  *United States v. Cooke*, 795 F.2d 527, 530 (6th Cir. 1986) (emphasis added) (quotation omitted); *see also United States v. Hogan*, 402 F. App'x 54, 59 (6th Cir. 2010) (noting voice-identification testimony was admissible even if the witness acquired familiarity with the voice *after* the time of recording).  What's more, a witness's familiarity with a voice need not come from "face-to-face conversation." *Pryor*, 842 F.3d at 452. "Nor must the witness be qualified as an expert."  *Id*. (citation omitted).

Each of the government's voice-identification witnesses passes the admissibility bar. Contrary to Carey's assertion, voice identification does not require an expert. *Id.*  And here, each witness had heard Carey's voice—either in person, on the phone, or on a recording—more than

once. This made them familiar enough with his voice to provide a lay opinion. Any remaining objections about the witnesses' "minimal contact[s]," motives for testifying, and "exposure to [Carey's] voice, go[] to the weight, not the admissibility of the evidence." *United States v. Branch*, 956 F.2d 1164, 1164 (6th Cir. 1992) (per curiam) (unpublished table decision). Carey appropriately placed such concerns before the jury during cross-examination. The district court neither erred nor abused its discretion in admitting the voice-identification testimony.

*Constructive Possession Instruction.* Carey and Brown challenge the district court's constructive possession instruction. We review this claim for abuse of discretion, reversing the district court's choice "only if the instruction[], viewed as a whole, [was] confusing, misleading, or prejudicial." *United States v. Taylor*, 800 F.3d 701, 709 (6th Cir. 2015) (quoting *United States v. Svoboda*, 633 F.3d 479, 483 (6th Cir. 2011)).

At trial, Carey and Brown each faced charges of possession with intent to distribute cocaine. The district court instructed the jury that, to find the defendants guilty of those charges, it must find they exercised actual or constructive possession over the cocaine. Constructive possession, it elaborated, exists when a person has a "right to exercise physical control over the cocaine" and intent to "exercise" that control—either directly or through other persons. (R. 12252, PageID 13530.) Brown and Carey don't challenge the legal accuracy of this instruction. Instead, they contend it "was not rationally supported by the evidence." (Brown Br. at 27.)

We begin with Carey's claim. He says the government presented "insufficient evidence" that he had the "right to exercise physical control" over any cocaine. (Carey Br. at 49.) Because "absolutely no drugs" were found in his presence, he argues the constructive possession instruction "would confuse a reasonable juror." (*Id.* at 50.) Not so. The government produced intercepted phone calls and texts between Carey and Mayfield that discussed cocaine drop-offs, quality, and price. Physical surveillance accompanied these communications. It showed that Mayfield made short trips to Carey's home right after they discussed a cocaine delivery. So for both of Carey's possession counts, the evidence showed that Carey had the right and intent to exercise control over cocaine. Brown's claim fails for similar reasons. During the trial, the

government presented evidence—in the form of physical surveillance, intercepted calls, and first-hand witness testimony—that tied Brown to cocaine possession and distribution for each of his possession counts.

In sum, for both Carey and Brown's possession charges, the government supplied more than enough evidence to justify the district court's constructive-possession instruction.

*Rule 29 Motions.* Brown and Kolarich appeal the district court's denial of their motions for acquittal. Both argue the government presented insufficient evidence at trial to support their various convictions.

We review challenges to the sufficiency of the evidence with fresh eyes. *See Taylor*, 800 F.3d at 711. De novo inquiry, though, doesn't mean we "weigh the evidence, assess the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Rosales*, 990 F.3d 989, 994 (6th Cir. 2021) (quoting *United States v. Smith*, 749 F.3d 465, 477 (6th Cir. 2014)). Instead, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We start with Brown's challenge. The jury convicted Brown on three counts: conspiring to distribute and possess with intent to distribute 500 grams or more of cocaine (Count 1); possessing with intent to distribute cocaine on April 8, 2018 (Count 5); and possessing with intent to distribute 500 grams or more of cocaine on May 7, 2018 (Count 12). Focusing on Counts 5 and 12, Brown contends that "[n]o transaction was observed or substantiated in the evidence in support of these counts." (Brown Br. at 27.)

The gist of Brown's complaint is that no investigator observed Brown cooking cocaine or distributing the product to his customers. And he's right about that. Still, the government produced plenty of direct evidence—in the form of intercepted calls, physical surveillance, and coconspirator testimony—that Brown worked closely with Mayfield as a wholesale distributor of cocaine. Consider the conspiracy count. The jury heard testimony, listened to recorded conversations, and read many texts showing Brown stayed in regular contact with Mayfield

about his sourcing trips, the operation's cocaine supply, and the cooking of crack cocaine. A rational trier of fact could find Brown possessed intimate knowledge of the Mayfield organization's workings and participated in many aspects of the trafficking. His conviction for conspiracy stands.

Next, the possession count for April 8, 2018. This time, intercepted communications showed that Brown asked Mayfield to bring him half an ounce of cocaine. Physical surveillance confirmed Mayfield fulfilled the order quickly, driving to Brown's home just 30 minutes later. Even though the government didn't see the cocaine in Brown's hands, it presented enough circumstantial evidence to justify the jury's conviction.

Last, the possession count for May 7, 2018. In spring 2018, Mayfield and Gentry's sourcing relationship hit hard times. As supplies dried up, Brown recruited a new cocaine supplier for Mayfield, named Craig James, and coordinated meetings between the two men. At trial, James testified that Brown accompanied Mayfield on multiple trips to pick up cocaine. On the May 7 trip, James noted that Brown and Mayfield secured a whole kilogram of cocaine. Again, it's true that the government didn't directly observe the May 7 transaction. Still, it presented evidence that would allow a reasonable juror to infer that Brown possessed 500 grams or more of cocaine with intent to distribute that day.

Like Brown, Kolarich challenges the sufficiency of the evidence for all three of her convictions. Remember that Mayfield handed off $50,000 in drug-trafficking proceeds to Kolarich, which she delivered to Gentry. Enlisting the help of two friends, Kolarich wired $15,900 of the cash directly to Gentry. She flew the rest of the money—around $34,100—down to Houston herself in a carry-on bag.

This courier role resulted in three charges: conspiring to distribute and possess with intent to distribute 500 grams or more of cocaine (Count 1); knowingly and intentionally using a communication facility to facilitate the cocaine conspiracy (Count 9); and interstate travel to distribute cash drug proceeds from the conspiracy (Count 10). The jury convicted her on all three counts. Now, Kolarich disputes the knowledge element of each charge, arguing "she was not aware of the cocaine conspiracy." (Kolarich Br. at 33.) The government, she alleges, didn't

produce "direct evidence" establishing her "precise knowledge" of the "existence and main purpose of the Mayfield conspiracy." (*Id.* at 30.)

At the outset, we note that the government need not present direct, or "smoking gun evidence," of a defendant's guilt. *Rosales*, 990 F.3d at 996. Instead, "circumstantial evidence alone is sufficient to sustain a conviction, even if it does not remove every reasonable hypothesis except that of guilt." *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (quotations and alterations omitted). Nor must the government establish "precise knowledge," like Kolarich suggests. (Kolarich Br. at 30.) "[A] statutory knowledge element [also] can be satisfied by 'the deliberate avoidance of knowledge.'" *United States v. Evans Landscaping Inc.*, 850 F. App'x 942, 950 (6th Cir. 2021) (quoting *United States v. Patel*, 651 F. App'x 468, 471 (6th Cir. 2016)).

In this case, the district court instructed the jury on both knowledge and deliberate ignorance. Take the conspiracy count. The district court told the jury it could find Kolarich guilty if it believed she "knew the conspiracy's main purpose" or "deliberately ignored a high probability the money was proceeds from the drug conspiracy." (R. 1252, PageID 13526, 13537.) At trial, the jury heard ample evidence of Kolarich's presence during key conspiracy events—evidence that would allow it to convict her under either theory of intent.

For instance, Kolarich knew Gentry had served time in federal prison for a previous cocaine conviction and that he met Mayfield there. She was present when Mayfield drove down to Houston to pick up five kilograms of cocaine from Gentry. And just five days after Mayfield's Houston trip, Kolarich traveled to Michigan to collect part of the money he owed Gentry for the drugs. Not long after, when Gentry flew up to Grand Rapids to try to gather the rest of money, Kolarich drove to meet him. Together, they spent two days trying to track Mayfield and the missing proceeds down. Later, when Kolarich comforted a shaken Gentry after he learned of Mayfield's arrest, she didn't express surprise or shock at the news.

Admittedly, the government never presented direct evidence of Kolarich's knowledge of the cocaine conspiracy. For example, Gentry—her boyfriend—never conceded that he told Kolarich the $50,000 came from drug trafficking. Even so, the abundance of circumstantial evidence presented at trial would allow a reasonable juror to infer Kolarich knew, or deliberately

ignored the fact, she acted as a participant in a cocaine conspiracy. Under either theory of intent, we conclude that the government met its evidentiary burden for the conspiracy charge.

Kolarich's arguments about the next two charges—Count 9 and Count 10—fall with the first. Indeed, Kolarich admits as much, acknowledging that "the same reasoning applies" to those counts as to the "conspiracy count." (Kolarich Br. at 33.) This admission makes sense. To convict Kolarich of the latter charges, the jury needed to find Kolarich knowingly used a telephone to "facilitate . . . the conspiracy" and traveled "knowingly . . . [to] distribute the proceeds" of the conspiracy. (R. 1252, PageID 13533–35.) The same evidence that would allow a reasonable jury to infer that Kolarich knew, or deliberately ignored the fact, that she acted as a participant in a cocaine conspiracy, also would permit it to make the identical inference as to the communication and travel counts.

In sum, the government presented sufficient evidence of Brown's and Kolarich's role in the drug-trafficking ring to support each defendant's three counts of conviction. We affirm the district court's denial of Brown's and Kolarich's Rule 29 motion.

III.

Each defendant, except Martinellus Nix, challenges some aspect of his or her sentence. We take up each of their arguments in turn.

*Drug-Quantity Calculation.* Brown and Carey challenge the drug quantities the district court used to calculate their sentences. We uphold a district court's drug-quantity determination unless it is "clearly erroneous." *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). To calculate drug-quantity, "[t]he district court can make a reasonable estimate based on physical evidence or testimony." *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020). And it can use this evidence to hold a defendant accountable for drug quantities "with which he was directly involved" or that were "reasonably foreseeable" to him as part of a criminal conspiracy. *Young*, 847 F.3d at 367 (quotation and alterations omitted). In the end, what matters is that the drug quantity assigned to a defendant is supported by "a preponderance of the evidence." *Jeross*, 521 F.3d at 570 (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)).

A preponderance of the evidence supported the drug quantities used to calculate each defendant's sentence. Begin with Brown. The district court held him responsible for five to 15 kilograms of cocaine. Brown's objection to this quantity mirrors his challenge to the sufficiency of the evidence. The government, he says, had no physical evidence tying him to more than five kilograms of cocaine. No officer saw him with drugs. And no search recovered contraband from his residence. But once again, Brown's argument ignores the extensive wiretap evidence, officer surveillance, and codefendant testimony that tied him to far more than five kilograms of cocaine.

Go back to Brown's recruitment of James as a cocaine supplier. Brown coordinated three cocaine deals with James for the Mayfield organization. So he is directly responsible for the 2.5 kilograms he received in those meetings. After a time, Brown's sister took over his coordination role. She secured another 4.5 kilograms and delivered the product to Mayfield. Mayfield then passed on some of this cocaine to Brown for distribution. Brown also knew about Mayfield's April 4 trip to Houston. While there, Mayfield obtained five kilograms of cocaine for the organization. Brown texted his sister and Mayfield about the trip, noting he "couldn't wait" for Mayfield's return. (R. 1246, PageID 12377.) The cocaine Brown's sister and Mayfield hustled for the operation also add to Brown's total.

At day's end, the drug quantities attributed to Brown were "reasonably foreseeable" and "within the scope of the criminal activity that [Brown] jointly undertook." *Young*, 847 F.3d at 367 (quotation omitted). Brown set up Mayfield's relationship with James. Then, he continued to receive cocaine from James's supply even after his sister took over pickup. He likewise knew Mayfield traveled to Houston to restock the organization's cocaine source and expected to benefit from the fresh supply. Given this evidence, "we are hard-pressed to see how the drug quantities involved were not 'reasonably foreseeable' to [Brown]." *Tisdale*, 980 F.3d at 1097. The district court didn't clearly err in calculating Brown's drug quantity.

Carey makes a similar argument, meriting a similar rejection. At sentencing, the district court attributed five kilograms of cocaine to Carey. These five kilograms also came from Mayfield's April 4 trip to Houston. In intercepted phone conversations, Carey repeatedly

encouraged Mayfield to go to Houston.  He wanted Mayfield to refresh the operation's cocaine supply so lower-level distributors like him could resume drug dealing.  The district court listened to these calls at trial and found Carey responsible for the five kilograms from the Texas trip.

Carey contends that five kilograms is too much because he never uttered those exact words in his conversations with Mayfield.  But a drug-quantity determination doesn't require explicit statements from a defendant.  Instead, a district court need make only a "reasonable estimate" based on the record.  *Tisdale*, 980 F.3d at 1096; *see also United States v. Parrish*, 915 F.3d 1043, 1048 (6th Cir. 2019) ("[T]he district court is free to make reasonable inferences from facts in the record when fashioning a sentence.").

The district court's calculation complied with this standard.  Carey's calls with Mayfield touched on earlier cocaine deliveries from Houston.  Those restocks included up to eight kilograms of cocaine.  The district court referenced this conversation to calculate Carey's drug quantity.  It reasonably inferred that Carey knew Mayfield would return from Houston with several kilograms of cocaine and urged him to make the trip for that reason.  This finding is not clearly erroneous.  After all, under a preponderance-of-the-evidence standard, the district court only need find it more likely than not that Carey had a hand in the five kilograms of cocaine.  Because it did that here, we affirm.

*Drug-Premises Enhancement.*  Brown challenges another aspect of his sentence: the drug-premises enhancement.  If a defendant maintains a premise to manufacture or distribute a controlled substance, the Guidelines add two levels to his sentencing range.  *See* U.S.S.G. § 2D1.1(b)(12).  Because Brown used his home to deal drugs, the district court applied the enhancement.  Brown says the district court got it wrong.  He insists the government presented no evidence that he distributed drugs from his home.  He also argues he didn't "maintain" his home for purpose of drug distribution. (*Id.* at 34-36.)

The district court made the right call.  Drug distribution need not be the "sole purpose for which the premises [is] maintained" for the enhancement to apply.  *Id.* § 2D1.1 cmt. n.17.  Instead, a defendant qualifies if distribution is "*one of* [his] primary and principal uses for the premises."  *Id.* (emphasis added).  Put another way, distribution must be a "significant or

important reason for which [the defendant] maintain[s] his home." *United States v. Johnson*, 737 F.3d 444, 448 (6th Cir. 2013) (quotation omitted). "Mere incidental or collateral use" will not do. *Id.* (internal quotations omitted).

Contrary to Brown's claims, the drug dealing activities in his home were neither collateral nor incidental. Phone calls, text messages, and surveillance evidence showed that he used his home to receive, weigh, distribute, and cook cocaine. Here's a highlight reel. Mayfield once dropped off half-ounce amounts of cocaine at Brown's home. Soon after, someone else arrived, went in the back door, and left a minute later. Brown also invited others over to cook crack cocaine. Brown even encouraged his sister to weigh out cocaine on his scales. And he texted her about cocaine deals taking place in and about his residence.

The district court put these events together. It found drug dealing was one of Brown's primary and principal uses for his home and applied the enhancement. Given Brown's extensive drug receiving, drug weighing, drug distributing, and drug-cooking activities, the district court did not clearly err in doing so.

*Safety-Valve Relief.* Kolarich challenges the district court's decision to deny her motion for safety-valve relief. Because a district court makes a factual finding when it grants or denies such a motion, we review for clear error. *United States v. Barron*, 940 F.3d 903, 914 (6th Cir. 2019) (citing *United States v. Adu*, 82 F.3d 119, 124 (6th Cir. 1996)).

A defendant may receive a sentence below the statutory mandatory minimum if she qualifies for relief under 18 U.S.C. § 3553(f). Designed only to benefit the defendants "who truly cooperate," the provision provides a "safety valve" for those who can satisfy its five criteria. *United States v. O'Dell*, 247 F.3d 655, 675 (6th Cir. 2011) (quotation omitted); 18 U.S.C. § 3553(f). The defendant must show she satisfies each requirement by a preponderance of the evidence. *United States v. Bolka*, 355 F.3d 909, 912 (6th Cir. 2004).

Here, the parties agree Kolarich meets four of the five criteria. But they dispute the fifth—whether Kolarich "truthfully provided the Government all information and evidence [she had] concerning the offense or offenses that were part of the same course of conduct" before the sentencing hearing. 18 U.S.C. § 3553(f)(5). This "tell all" criterion "requires a defendant to

admit the conduct charged." *O'Dell*, 247 F.3d at 675. But that's not all. It also imposes an affirmative obligation to "volunteer any information aside from the conduct comprising the elements of the offense." *Id.* (quoting *United States v. Arrington*, 73 F.3d 144, 149 (7th Cir. 1996)); *see also* U.S.S.G. § 5C1.2 cmt. n.3 (noting the fifth requirement includes information about "the offense of conviction and all relevant conduct").

At the sentencing hearing, Kolarich contended that she did just this. She said she gave the government "all information and evidence that she had concerning the conspiracy." (R. 1197, PageID 11225.) Besides, she urged, "there [was] no evidence that [she] knew . . . that the money" she received "was cocaine proceeds." (*Id.* at 11227.) The government disagreed. It argued she had not fully disclosed "her involvement in the offenses" because she refused to fully "admit the conduct charged." (R. 1187, PageID 11144.); *O'Dell*, 247 F.3d at 675. That is, Kolarich stood firm to her assertion that she did not know and should not have known the $50,000 came from cocaine dealing.

The district court sided with the government. It found Kolarich didn't "fully admit her involvement in the case." (R. 1255, PageID 13668–69.) The court compared the jury's conviction of Kolarich, which required a finding of actual knowledge or deliberate ignorance, with Kolarich's assertion that she didn't know the $50,000 came from drug trafficking. In the court's view, Kolarich's complete denial of conspiracy knowledge and her decision to proceed to trial showed that she didn't truly cooperate. Kolarich contests this finding on appeal, reiterating her argument that the "record strongly suggests" she did not know and should not have known "she was a participant in the conspiracy."[2] (Kolarich Br. at 37.)

We disagree. To qualify for safety-valve relief, Kolarich needed to admit, at a minimum, "the conduct comprising the elements of the offense." *O'Dell*, 247 F.3d at 675 (citation

---

[2]On appeal, Kolarich also argues that "[a] defendant is not automatically foreclosed from safety valve relief because [she] go[es] to trial and [is] convicted." (Kolarich Br. at 36.) This Court hasn't yet taken a firm stance "in the debate over whether a guilty verdict precludes safety valve relief for a defendant whose safety-valve statement contradicts the verdict." *See United States v. Honea*, 660 F.3d 318, 328 (8th Cir. 2011) (quotations and alterations omitted). But we need not do so here. That's because the government doesn't contest Kolarich's argument about a "defendant's exercise of [her] right to a trial by jury." (Kolarich Br. at 36.) Rather, it focuses its arguments on Kolarich's failure to satisfy her burden of proof. Because we agree that Kolarich failed to "admit the conduct charged," *O Dell*, 247 F.3d at 675, we save the jury-verdict issue for another day.

omitted). This she did not do. Recall that the government charged Kolarich with three offenses. Each offense included a knowledge element that required a showing of actual knowledge or deliberate ignorance. So to satisfy the tell-all criteria, Kolarich needed to "provide[]" "all information and evidence" about her knowledge of the conspiracy. 18 U.S.C. § 3553(f)(5). But Kolarich never made any admissions consistent with actual knowledge or deliberate ignorance. Instead, she asserted her innocence as to any knowledge of the cocaine conspiracy throughout the pretrial, trial, and sentencing proceedings. What's more, Kolarich made this choice despite the government's evidence that she knew about or deliberately ignored her role in the drug-trafficking conspiracy. The jury heard that evidence and found it sufficient to establish Kolarich's mental culpability. So it returned a guilty verdict on all three offenses. The district court reviewed the same facts, considered the jury's verdict, and reached a similar conclusion: Kolarich's insistence on her innocence contradicted the evidence. This meant she didn't "truthfully provide" "all information" about "the conduct charged." 18 U.S.C. § 3553(f)(5). At day's end, "the district court simply did not believe that [Kolarich] [told] the subjective truth as [she] knew it." *United States v. Aguilera*, 625 F.3d 482, 488 (8th Cir. 2010). So it denied her motion for safety-valve relief.

Given the extensive circumstantial evidence presented at trial, we cannot say the district court clearly erred in doing so. Besides, when faced with the government's challenge to her safety-valve claim, Kolarich never pointed to any disclosure or statement consistent with actual knowledge or deliberate ignorance. Instead, she insisted that there was no evidence she knew about the conspiracy. So at bottom, Kolarich failed to satisfy her burden of proof. *See Barron*, 940 F.3d at 917–18 ("Where the government challenges a defendant's claim of complete and timely disclosure and the defendant does not produce evidence that demonstrates such disclosure, a district court's denial of [safety-valve relief] is not clearly erroneous." (citations and quotations omitted)). Because the safety-valve provision "requires a defendant to admit the conduct charged," *O'Dell*, 247 F.3d at 675, and because the district court did not clearly err in finding the evidence showed Kolarich failed to do so, we affirm its denial of safety-valve relief.

*Career-Offender Enhancement.* Marvin Nix challenges the district court's application of the career-offender enhancement to his sentence. Because Nix raised this argument below, we

review his claim de novo.  *United States v. Havis*, 927 F.3d 382, 384 (6th Cir. 2019) (en banc) (per curiam).

To qualify as a career offender, a defendant must have at least two prior felony convictions for either a crime of violence or a controlled-substance offense.  *See* U.S.S.G. § 4B1.1.  Nix had one of each.  He was convicted under Michigan state law for (1) delivery or manufacture of a controlled substance and (2) armed robbery.  Nix argues the former conviction—for delivery or manufacture of a controlled substance—is not a controlled substance offense.  If he's right, the district court misapplied the enhancement.  His single armed-robbery conviction would fall one conviction short of the career-offender threshold.

But Nix is wrong.  The Guidelines define a controlled-substance offense as "an offense under federal or state law . . . that prohibits the manufacture import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense."  U.S.S.G. § 4B1.2(b).  We use a "categorical approach" to determine whether a federal or state statute fits within this definition.  *United States v. Booker*, 994 F.3d 591, 595 (6th Cir. 2021) (quotation omitted).  If the "outer edges of the state law—often the 'least culpable conduct' that the law proscribes"—fall outside of § 4B1.2's definition, "then the conviction doesn't count."  *United States v. Garth*, 965 F.3d 493, 495 (6th Cir. 2020); *see also United States v. Thomas*, 969 F.3d 583, 584–85 (6th Cir. 2020) (per curiam).

Our decision in *Havis* illustrates the categorical approach at work.  In that case, we held that "attempt crimes do not qualify as controlled substance offenses."  *Havis*, 927 F.3d at 387.  So if a state or federal offense covers an attempt crime, a conviction for that offense can't serve as a predicate for the career-offender enhancement.  The least culpable conduct criminalized by the statute—an attempt—would "fall outside" the definition of a controlled-substance offense.  *See Thomas*, 969 at 584; *see also Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007).

Contrary to Nix's assertions, his conviction under the Michigan delivery statute falls within, not outside the Guidelines.  That statute defines delivery as "the actual, constructive, or attempted transfer" of a controlled substance.  Mich. Comp. Laws § 333.7105(1).  Under federal

law, distribution means delivery, and it's described in identical terms: "the actual, constructive, or attempted transfer of a controlled substance." 21 U.S.C. § 802(8), (11); *see Garth*, 956 F.3d at 496. Because "there is no meaningful difference between the federal offense of distribution and the Michigan offense of delivery," Nix's Michigan conviction qualifies as a controlled-substance offense. *Thomas*, 969 F.3d at 585.

Nix counters with *Havis*'s exemption of attempt crimes. Michigan's delivery statute covers the "attempted transfer" of a controlled substance. *See* Mich. Comp. Laws § 333.7105(1). So Nix contends *Havis* applies, and his conviction isn't a controlled-substance offense. Binding precedent forecloses this argument. In *United States v. Garth*, we clarified that "delivery means attempted *transfer*, not an attempted *delivery*." 965 F.3d at 497. And in *Thomas*, we applied *Garth* to hold that Michigan's delivery statute fell squarely within the Guidelines' definition of a controlled-substance offense. 969 F.3d at 585. What was true in *Thomas* is true here. Because "an attempted transfer qualifies as a completed delivery," *Havis*'s exclusion of attempt crimes doesn't apply to Michigan's delivery statute. *Id.*; *see also Booker*, 994 F.3d at 595–96 (explaining that *Thomas* forecloses application of *Havis* to the Michigan delivery statute).

Because Nix had two prior felony convictions—one for a crime of violence and one for a controlled-substance offense—we affirm the district court's application of the career-offender enhancement.

*Substantive and Procedural Reasonableness.* Gardner and Brown attack the reasonableness of their sentences. A district court's sentencing decision must be procedurally and substantively reasonable. *United States v. McCarty*, 628 F.3d 284, 289 (6th Cir. 2010). The former focuses on the method the district court uses to arrive at the length of a sentence. The latter considers whether the length of the sentence itself is reasonable given "the totality of the circumstances." *Wandahsega*, 924 F.3d at 886. A bit more about each below.

A district court's sentencing decision should explain how and why it arrives at a sentence. *See Gall v. United States*, 552 U.S. 38, 50 (2007). So as a matter of process, a district court must properly calculate the Guidelines range, consider the § 3553(a) factors (as well as any arguments for a sentence outside the range), and adequately articulate its reasons for the chosen

sentence. *See Dunnican*, 961 F.3d at 880. From a holistic point of view, what matters is that the district judge "listened to each argument, considered the supporting evidence, was fully aware of the defendant's circumstances and took them into account." *United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (en banc) (internal quotation marks omitted) (quoting *Rita v. United States*, 551 U.S. 338, 358 (2007)). When a district court adheres to these steps and gives a reasoned explanation for its decision, there is no procedural error.

Typically, we assess procedural reasonableness for abuse of discretion. *See Gall*, 552 U.S. at 41. But if a defendant fails to object to a procedural defect at sentencing, we review for plain error instead. *See United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010).

As to substance, the "touchstone" of our review is "whether the length of the sentence is reasonable in light of the § 3553(a) factors." *United States v. Tate*, 516 F.3d 459, 469 (6th Cir. 2008). We presume a within-Guidelines sentence is substantively reasonable. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006). But a defendant can rebut this presumption if a district court chose a sentence arbitrarily, ignored pertinent § 3353(a) factors, or gave unreasonable weight to any single factor. *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008). We always review this aspect of a sentencing decision for abuse of discretion. *United States v. Sherrill*, 972 F.3d 752, 769 (6th Cir. 2020) (citation omitted). Unlike a procedural defect, a defendant need not raise it below. *Id.*

*1. Brown's Sentence.* Brown contends his sentence is neither procedurally nor substantively reasonable. We consider procedure first. Brown says the district court erred when it refused to grant his motion for a downward variance. Because he failed to raise this defect below, we review for plain error. *United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004).

No error occurred. The district court properly calculated the advisory Guideline range of 168 to 210 months. This range reflected an offense level of 32 and a criminal history category of IV. It then applied the § 3553(a) factors. Brown's extensive criminal history, his failure to comply with court orders and conditions, and his significant role in the drug conspiracy underscored the district court's decision. Emphasizing the need for deterrence—given Brown's

criminal past and the "amount of drugs" he helped push in "the streets of Grand Rapids"—the court imposed a sentence of 204 months. (R. 1254, PageID 13653.)

Along the way, the district court also "listened to each argument" Brown raised. *See Vonner*, 516 F.3d at 387. It even took special notice of the fact that Brown's criminal history was made up (for the most part) of misdemeanors. But even after it considered Brown's evidence, the district court found "no support in th[e] record" for a downward variance. *Id.*; (R. 1254, PageID 13653.) It did not err, much less plainly, in doing so. Instead, its reasoning showed it was "fully aware of [Brown's] circumstances." *See Vonner*, 516 F.3d at 387 (internal quotation omitted). And its explanation sufficed for a within-Guidelines sentence. *See Rita*, 551 U.S. at 356 ("[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation.").

But our analysis doesn't end there. Brown also claims his sentence is substantively unreasonable. We disagree. The district court focused on the § 3553(a) factors and highlighted the ones it found most important. Those were "the history and characteristics of the defendant, the nature [and] seriousness of the offense, [promoting] respect for the drug laws of the United States, [] provid[ing] just punishment, and protect[ing] the public from further crimes of the defendant." (R. 1254, PageID 13654). The district court based its sentence on those factors, did not place undue weight on any one of them, and did not consider illegitimate factors. So the sentence was substantively reasonable.

Brown responds that the district court's decision still shows "statutory imbalance." (Brown Br. at 39.) In his view, the district court failed to credit certain sentencing factors (like Brown's physical disabilities and relationships with his children) and over-emphasized other factors (like the need to punish and deter). This disparity, Brown says, means his sentence "is greater than necessary to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010) (internal quotation omitted). It's true the district court attached great weight to certain factors. But "[n]ot all" § 3553(a) factors "are important in every sentencing." *United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007). "[O]ften one or two prevail, while others pale." *Id.* No doubt, the district court did

not weigh the § 3553(a) factors as Brown hoped. *See United States v. Robinson*, 892 F.3d 209, 216 (6th Cir. 2018). But that reality alone doesn't create an abuse of discretion. And Brown has failed to show otherwise.

Because the district court's sentencing decision was procedurally and substantively reasonable, we affirm.

*2. Gardner's Sentence.* Gardner challenges only the substantive reasonableness of his sentence. At 168 months, his sentence reflects an upward variance of 17 months. This above-Guidelines sentence has both an "upside" and a "downside" for Gardner. *United States v. Thomas*, 933 F.3d 605, 613 (6th Cir. 2019). On the one hand, the upward variance "erases any presumption of reasonableness." *Id.* But on the other, the variance doesn't "trigger a presumption of *un*reasonableness" either. *Id.* The defendant still must make the same abuse-of-discretion showing. That is, that "the length of the sentence is [un]reasonable in light of the § 3553(a) factors." *Tate*, 516 F.3d at 469.

The district court's 17-month variance was not an abuse of discretion. It acknowledged the Guidelines served as "an initial benchmark," listed the § 3553(a) factors, and assured Gardner it considered his arguments "for a lower sentence." (R. 1219, PageID 11431.) Then, it took care to explain why it found the initial benchmark insufficient in Gardner's case. Gardner had a storied history of drug-related criminal activity. This history included convictions for the use of marijuana, the use of cocaine, possession with intent to distribute marijuana, possession with intent to distribute 50 grams or more of cocaine, and the delivery or manufacture of cocaine. The latest chapter began when Gardner, fresh out of prison and still on supervised release, joined Mayfield's drug-trafficking operation. (*Id.*) In the "short period of time" between his release from prison in early 2018 and the operation's takedown that May, Gardner managed to have a hand in more than "17 kilograms of cocaine." (R. 1219, PageID 11433.) Given his "inability" to "conform his conduct" to the law, the district court found the Guidelines range inadequate to deter Gardner, protect the public, and provide just punishment. (*Id.* at 11434). So it varied upward two-levels to impose a 168-month sentence. Because "the court supported its variance

with rational reasons rooted in the § 3553(a) factors," its sentence was substantively reasonable. *Thomas*, 933 F.3d at 613.

Gardner counters that the district court disregarded "the sentences received by equally (or more) culpable codefendants," his "deplorable childhood," his "challenging personal background," and his "limited participation in th[e] offense." (Gardner Br. at 53.) But the district court's decision refutes each of his concerns. Far from ignoring Gardner's background, the district court "recognize[d] the extreme difficulty of his childhood" and "considered it." (R. 1219, PageID 11439.) As for Gardner's level of participation, the district court listened to Gardner's many phone calls with Mayfield. It also took the 17 kilograms of cocaine attributed to Gardner into account. Viewing this evidence together, the court found Gardner was "well within this drug conspiracy." (*Id.* at 1433.) To be sure, Gardner may not have been the ringleader, like Mayfield, or the primary supplier, like Gentry. But his participation was far from limited. And the district court did not overestimate his role.

As for Gardner's codefendants, he's right that many received shorter sentences for similar amounts of drugs. And it's true that the Guidelines instruct courts to "avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6). But that factor is concerned with national disparities among similarly situated defendants, "not disparities between particular codefendants." *Conatser*, 514 F.3d at 521 (citation omitted). Besides, many of Gardner's codefendants cooperated with the government and received "very significant 5K motions." (R. 1219, PageID 11417.) Of course, those motions alone may not "explain the [] disparities." (Gardner Br. at 47.) But that's where Gardner's extensive criminal history comes into play. Gardner had a criminal history category of IV. Many of his codefendants had a criminal history category of I or II. And with Gardner's higher criminal history came a higher Guidelines range.

In the end, Gardner "does not identify any argument that he raised and the district court failed to address." *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006). Instead, he "asks us to balance the factors *differently* than the district court did." *Id.* We decline his invitation. Our review "looks to whether the sentence is reasonable," not to whether we "would have imposed the same sentence" in the first instance. *Id.* In view of Gardner's criminal history and

recidivism rate, the district court reasonably concluded that Gardner's track record warranted an upward variance. We "give due deference to [its] decision that the § 3553(a) factors" justify that variance and affirm. *See Robinson*, 892 F.3d at 213 (quoting *Gall*, 552 U.S. at 51).

*Federal-Benefits Eligibility.* Gardner also contests another part of his sentence: the imposition of a lifetime ban on federal benefits. Gardner pleaded guilty to one count of conspiracy to distribute and possess with the intent to distribute cocaine and cocaine base. The district court found this conviction required a permanent bar on Gardner's receipt of federal benefits under 21 U.S.C. § 862(a). At sentencing, Gardner protested the application of § 862(a) to his sentence. (*Id.*) Because he raised the issue below, we review the district court's interpretation of § 862(a) de novo. *United States v. Spencer*, 620 F.3d 701, 703 (6th Cir. 2010).

Section 862 provides for the denial of federal benefits for defendants convicted of drug offenses. The length of this federal-benefit ban depends on two variables: (1) the kind of offense and (2) the number of prior convictions. In this vein, § 862 distinguishes between "[d]rug traffickers" and "[d]rug possessors." 21 U.S.C. § 862(a), (b). A drug-trafficking offense consists of the "distribution of controlled substances." *Id.* § 862(a). If a defendant has one distribution conviction, the district court may order him ineligible for "all [f]ederal benefits for up to 5 years." *Id.* § 862(a)(1)(A). At two such convictions, the time increases to "up to 10 years." *Id.* § 862(a)(1)(B). And "upon a third or subsequent [distribution] conviction," a defendant is "permanently ineligible for all [f]ederal benefits." *Id.* § 862(a)(1)(C).

The district court found that Gardner fell into that last category. It decided that Gardner's drug-conspiracy conviction qualified as his third drug-trafficking offense. And that conviction permanently disqualified him from the receipt of federal benefits.

The lifetime ban raises an issue of first impression in this Court: Does conspiracy to distribute and possess with intent to distribute qualify as an "offense consisting of the distribution of a controlled substances" under § 862(a)? Gardner says that it doesn't, and the government concedes he's right. We agree with the parties' shared position.

Section 862(a) covers offenses consisting of the "distribution of a controlled substance." 21 U.S.C. § 862(a). Distribute means "to deliver (other than by administering or dispensing) a

controlled substance." 21 U.S.C. § 802(11). Delivery, in turn, is defined as "the actual, constructive, or attempted transfer of a controlled substance." *Id.* § 802(8). So for an offense to fall under § 862(a), it must include "actual distribution," or a completed delivery (which would include an attempted transfer), as an element. *See United States v. Williams*, 541 F.3d 1087, 1090 (11th Cir. 2008) (per curium). If Congress had meant otherwise—intending § 862(a) also to cover offenses consisting of the *intention* or a *conspiracy* to distribute—it could have said so. But it didn't. *See United States v. Silva-De Hoyos*, 702 F.3d 843, 849 (5th Cir. 2012) (explaining that when Congress intends for "intent to distribute" to act as a prerequisite for a particular sentence, it expressly says so).

Turn to the conviction at hand. Gardner pleaded guilty to one count: conspiracy to distribute and possess with intent to distribute cocaine and cocaine base under 21 U.S.C. § 846. That offense requires three things. First, "an agreement to violate drug laws, in this case 21 U.S.C § 841." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009). Second, "knowledge and intent to join the conspiracy." *Id.* And third, "participation in the conspiracy." *Id.*; *cf. United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). Missing from the offense's list of elements? Actual distribution. In other words, conspiring to distribute or possessing with the intent to distribute is not the equivalent of actual distribution. This means Gardner's drug conspiracy conviction falls outside of § 862(a)'s reach and cannot serve as the predicate for a lifetime ban on federal benefits.[3] The district court erred in concluding otherwise. For this reason, we vacate the district court's imposition § 862(a)'s lifetime ban on federal benefits and remand for resentencing consistent with this opinion.[4]

---

[3]Five of our sister circuits have reached similar conclusions about the reach of § 862(a). *See, e.g.*, *Silva-De Hoyos*, 702 F.3d at 849 (holding that a conviction for possession with intent to distribute was not an offense consisting of distribution under § 862(a)); *United States v. Jacobs*, 579 F.3d 1198, 1200 (10th Cir. 2009) (same); *United States v. Williams*, 541 F.3d 1087, 1090–91 (11th Cir. 2008) (same); *United States v. Rangel*, 823 F. App'x 466, 472 (9th Cir. 2020) (mem.) (same); *United States v. Taylor*, 698 F. App'x 67, 68–69 (4th Cir. 2017) (per curiam) (same for a conviction for conspiracy to distribute and possess with intent to distribute cocaine); *United States v. McCormick*, 603 F. App'x 194, 196–97 (4th Cir. 2014) (per curiam) (same for a drug manufacturing conviction).

[4]The parties agree on the remand but disagree about its scope. The government admits § 862(a) doesn't cover Gardner's conspiracy conviction. But it doesn't leave it at that. Instead, it offers an alternative: § 862(b). Section § 862(b) imposes a one-to-five-year ban on federal benefits for offenses "involving the possession of a controlled substance." The government urges us to hold that Gardner's drug-conspiracy conviction is an offense

IV.

For these reasons, we affirm the district court on all claims but one.

---

"'involving' possession" that merits the application of § 862(b)'s five-year ban.  (Gov. Br. at 179.)  Gardner, of course, argues the other way.  He asks us to limit our remand to the removal of § 862(a)'s lifetime ban.

We decline to take either path.  The imposition of § 862(b)'s one-to-five-year ban, unlike § 862(a)(1)(C)'s lifetime ban, is left to the district court's discretion.  So on remand, the district court may consider—in the first instance—whether Gardner's drug-conspiracy conviction falls into § 862(b)'s ambit.